UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————

SCOTT F. DOLL,

                          Petitioner,

                                                **No. 6:15-cv-06400(MAT)**
            -vs-                                **DECISION AND ORDER**

PAUL CHAPPIUS, as Superintendent of
Elmira Correctional Facility,

                          Respondent.

—————————————————————

## INTRODUCTION

Represented by counsel, Scott F. Doll ("Petitioner") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of the judgment entered against him on July 2, 2010, in New York State Genesee County Court (Noonan, J.), following a jury verdict convicting him of one count of Murder in the Second Degree (New York Penal Law ("P.L.") § 125.25(1)). For the reasons discussed herein, Petitioner's request for a writ of habeas corpus is denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Petitioner does not raise any claims regarding his trial or sentencing but instead presents issues concerning his detention, interrogation, and transport to the police station and trial counsel's representation at the suppression hearing. Therefore, the following factual recitation is mainly confined to these areas, and

is gleaned mainly from the transcript[1] of the suppression hearing held before Judge Noonan ("the Trial Court") on June 16, 2009.

On February 16, 2009, at 8:44 p.m., Deputy James Diehl ("Diehl") of the Genesee County Sheriff's Office heard a dispatch regarding a suspicious person observed by Jamie Waff ("the 911 caller"), a member of the Pembroke Fire Department. Diehl found Petitioner, who met the description provided by the 911 caller, walking on Route 5 and North Lake Road in the Town of Pembroke. It was a very cold night, but Petitioner was wearing one-piece camouflage coveralls that were unzipped and a white firehood that completely covered his head except his eyes. Diehl noticed a 12½-half inch metal object (later identified as a car jack) fall from Petitioner's pocket and a black cylinder (later identified as a lug wrench), sticking out of Petitioner's right waist pocket. Diehl also noticed what appeared to be fresh, wet blood on the knees and thighs of Petitioner's coveralls; a blood mark about the size of a quarter on his right knuckle; and a screwdriver in his pocket.

In response to Diehl's query about what he was doing, Petitioner replied that he was walking and "trying to lower his heart rate and cholesterol" because he had a doctor's appointment

[1] The transcript of the suppression hearing (hereinafter referred to as "Supp. Tr.") is located in Docket No. 12-1 at pages 36 to 173. These page numbers refer to the pagination assigned by the Court's CM/ECF system. However, when citing to particular pages in the transcript, the Court will use the original page numbers in the transcript.

the next morning. Petitioner supplied his driver's license and an identification card indicating he was a state corrections employee. Petitioner told Diehl that he had parked his mother's van, a red Ford, on the corner and that he lived in Corfu. Diehl asked Petitioner why he was walking in the area if he lived in Corfu. Petitioner replied that he had just dropped off a car at an automobile auction, and on his way back he stopped to walk. Diehl acceded to Petitioner's request to drive him back to get his van.

Diehl then noticed that Petitioner was wearing extremely worn sneakers that appeared to have blood on them. Diehl asked Petitioner where he was going with the items (lug wrench, car jack, and screwdriver), and Petitioner said that he was going to a friend's house "just up the road." However, he was unable to remember the name of the road or provide correct directions.

As Petitioner and Diehl were speaking, the 911 caller arrived and confirmed to Diehl that when he had seen Petitioner at the corner of Route 5 and North Lake Road, Petitioner turned away from him and crouched down between two parked vehicles. The passenger who was with the 911 caller confirmed this account.

Diehl then asked Petitioner to step out of the back of his patrol car, placed handcuffs on him, and patted down his outer layer of clothes, finding a cigarette lighter, a key to a Pontiac, and a receipt. Diehl remarked that he did not know what was going on, but some of Petitioner's statements did not make sense, and he

was detaining Petitioner until he could figure out what had happened. Diehl asked Petitioner about the fresh blood on his clothing; Petitioner replied that he "butchered deer."

Diehl then drove Petitioner to the location where he had parked his mother's van, a garage on the corner of Route 5 and North Lake Road. Parked next to Petitioner's mother's van were a blue car and a white van. On the hood of the blue car, Diehl noticed a pair of winter work gloves with blood on them. Diehl radioed a request to have Deputy Patrick Reeves ("Reeves") come to the scene to assist him.

Reeves, who had known Petitioner and his family for quite some time, soon arrived on the scene. Reeves described the work gloves on the blue car as "blood soaked." Reeves and Diehl also saw blood on the exterior of the Petitioner's mother's van, on the steering wheel and armrest, on the driver's side door, on the exterior of the blue car, and in the snow between the two cars. Shining his flashlight in the rear of Diehl's car, Reeves saw that Petitioner had blood on various areas of his face, as well as a lot of fresh blood on his right thigh and on the "knee area" of his coveralls. Reeves knew that Petitioner processed deer in the past; he testified that he thought Petitioner had probably just shot a deer or something, but he also "absolutely" was concerned that it might be from a victim who was seriously injured or dead. Reeves addressed Petitioner by his first name and asked, "What's going

on?" Petitioner "just shrugged his shoulders" and said, "I'm taking a walk, getting a cardio workout." When Reeves asked where he was headed, Petitioner responded "just up the road[,] going to a friend's house," but he "couldn't come up with the name of the road." When Reeves asked why he was covered in blood, Petitioner did not respond initially but mentioned that he was wearing "his old coveralls and [it] was deer blood on them[.]" Reeves responded that it was "obvious that this [was] fresh blood" and asked whether Petitioner had shot a deer out of season, as that was not uncommon in the rural area where they lived. Petitioner responded, "I can't tell you that." Reeves asked Petitioner if it was human blood and inquired if should he get an ambulance for someone. Petitioner again responded, "I can't tell you that[,]" and added, "Pat, you know me better than that. . . ."

Petitioner admitted to Reeves that he did not have permission from the garage owner to park his van there. He then told Reeves that it was his mother's van and he borrowed it because his daughter borrowed his car. Petitioner again claimed he was just out getting a "cardio workout." Reeves pleaded with Petitioner to just let him know if it was deer blood, telling Petitioner that if he shot a deer out of season, the worst-case scenario was that he might lose his hunting license for three to five years and be required to pay a fine. Petitioner replied, "I'm a few months from retiring. . . . I can't tell you that."

Reeves then had Petitioner get out of the car, and showed him the fresh blood on the front fender of his mother's van. When Reeves asked him why the blood was there, Petitioner again replied, "I can't tell you that." Reeves pointed out the blood spots in the snow that were coming from holes in Petitioner's sneakers. Again, Petitioner said that "he couldn't tell" Reeves about that. Reeves told Petitioner that he was hoping it was just a deer in the ditch, and pleaded with Petitioner to show him where it was so they could all go home. Otherwise, Reeves said, he would have to call an investigator and tow the van. To that, Petitioner responded, "[D]o what you got to do."

Toward the end of Reeves' conversation with him, Petitioner mentioned that he "guess[ed]" he wanted an attorney. Reeves asked him the name of his attorney; Petitioner referred to his "divorce attorney" but could not remember his name.

After he had been at the scene for about ten minutes, Reeves called Investigator Kristopher Kautz ("Kautz") and requested his presence. On arrival, Kautz saw blood on the steering wheel of Petitioner's mother's van, as well as the driver's arm rest and the floor board area. Kautz asked Petitioner if someone had been injured; Petitioner replied that "he did not know of anyone" and that there was nothing that he could tell Kautz.

Kautz had the van seized and transported to the Sheriff's Department, where it was placed in the garage; he also seized the

bloody gloves that were lying on the hood of the blue car. At 11:45 p.m., about three hours after Diehl arrived on the scene, Petitioner was driven to the Sheriff's Department so his clothing could be collected and he could be photographed. At about 1:30 a.m., after he was photographed, but before the police seized his clothing, Kautz and Petitioner heard a live radio dispatch stating that the police had found a dead body on Knapp Road in Pembroke, in the vicinity where Petitioner was found walking. Kautz observed no reaction from Petitioner. Kautz then collected Petitioner's coveralls, sneakers, socks, pants, sweat shirt, and swabbed two drops of blood from Petitioner's face.

At about 3:30 a.m., Petitioner's girlfriend, Stacy Allen, and his friend, Teresa Zelaszkiewicz ("Zelaszkiewicz"), a retired corrections officer, arrived at the Sheriff's Department. Zelaszkiewicz asked repeatedly to speak with Petitioner but Kautz declined. Eventually, Kautz permitted it, but made clear to her that he would be physically present during the entire conversation and might write down any of Petitioner's comments. Kautz told Petitioner that Zelaszkiewicz wanted to speak with him, and Petitioner did not object. Zelaskiewicz asked Petitioner several questions about what had happened. Petitioner told her, inter alia, "I was there, but I didn't do anything."

The dead body discovered by the police was identified as Joseph E. Benaquist ("Benaquist"), Petitioner's friend and business

partner. The cause of Benaquist's death was blunt force trauma to the head, caused by seven to eight blows with a blunt instrument. Benaquist's body was left between two parked cars in the driveway of his home.

On February 17, 2009, Petitioner was arrested and charged with Benaquist's murder. On February 19, 2009, a grand jury returned an indictment charging Petitioner with one count of second-degree (intentional) murder.

On October 7, 2009, the Trial Court issued a written decision and order denying suppression of Petitioner's statements and all other evidence except for the results of the buccal swab. (State Court Records ("SR.")[2] 820-32).[3] The Trial Court found that the deputies had "reasonable grounds to believe that there was an emergency at hand and an immediate need to intervene . . . which justified the continued detention of [Petitioner] without counsel or <u>Miranda</u> warnings[.]" (SR.830 (citations omitted)).

Petitioner's trial was held from May 3, 2009, to May 19, 2009, before Judge Noonan. On May 20, 2009, the jury returned a verdict convicting Petitioner as charged in the indictment. On July 2,

---

[2]

Citations in parentheses to "SR." refer to pages in the state court records submitted by Respondent in connection with his Response to the Petition.

[3]

Buccal swabs of Petitioner were later obtained with his consent, after the Trial Court issued an order to show cause.

2010, Petitioner was sentenced to an indeterminate term of imprisonment of 15 years to life.

Represented by new counsel, Petitioner appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division"). In a three-two decision, the Appellate Division affirmed the conviction on July 6, 2012. People v. Doll, 98 A.D.3d 356, 948 N.Y.S.2d 471 (4th Dep't 2012). On August 20, 2012, one of the dissenting Appellate Division justices granted Petitioner leave to appeal to the New York Court of Appeals ("Court of Appeals"). People v. Doll, 19 N.Y.3d 1003 (2012). On October 17, 2013, the Court of Appeals affirmed Petitioner's conviction. People v. Doll, 21 N.Y.3d 665, 672 (2013), rearg. denied, 22 N.Y.3d 1053 (2014), cert. denied, 134 S. Ct. 1552 (2014).

Petitioner presented an ineffective assistance of trial counsel claim in a counseled motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. Petitioner alleged that trial counsel failed to properly present an argument pursuant to Dunaway v. New York, 442 U.S. 200 (1979), that he was subjected to a full arrest, without probable cause, when he was transported to the Sheriff's Department. The Trial Court denied the motion without a hearing in a written decision. SR.3378-81. The Appellate Division denied leave to appeal on June 13, 2015.

This timely Petition (Docket No. 1) followed. For the reasons set forth below, the Court finds that Petitioner has not demonstrated entitlement to a writ of habeas corpus.

## MERITS OF THE PETITION

### I. Admissibility of Petitioner's Statements at the Garage to the Sheriff's Deputies (Ground 1(a))

Petitioner reasserts his claim, raised on direct appeal, that his statements at the garage to the sheriff's deputies should have been suppressed because he was questioned while in custody without being provided with Miranda warnings and after invoking his right to counsel, and the public safety exception to Miranda did not apply because there was no known victim. The Appellate Division found that a reasonable person under those circumstances would not have felt free to leave, and thus Petitioner was in custody for Miranda purposes. Doll, 98 A.D.3d at 363 (citations omitted). However, the deputies did not violate Petitioner's right to counsel or his Miranda rights under the particular circumstances because their "need to gain information about a possibly injured victim or victims permitted the deputies to continue questioning defendant, despite his request for an attorney, under the doctrine that is variously known as the rescue, emergency, or public safety doctrine." Id. (citation omitted).

The Court of Appeals affirmed, finding that the "unusual circumstances," Doll, 21 N.Y.3d at 669, presented to the deputies made it "reasonable for the police to believe that a person may

have been seriously injured and in need of imminent emergency assistance." <u>Id.</u> at 671. Therefore, "the emergency doctrine justified the police questioning[,]" <u>id.</u>, notwithstanding "the fact that police did not know definitively whether a crime had occurred or the identity of the potential victim . . . because the emergency doctrine is premised on reasonableness, not certitude[.]" <u>Id.</u> (citations omitted).

"When[, as here,] a state court adjudicates a habeas petitioner's claim on the merits, the reviewing court "must afford that decision the deferential standard of review established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") in 28 U.S.C. § 2254(d)." <u>Hawkins v. Costello</u>, 460 F.3d 238, 242 (2d Cir. 2006) (citation omitted). Under § 2254(d)(1)'s "unreasonable application" prong, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000). "Under the 'contrary to' clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13.

After reviewing the state courts' decisions in light of the Supreme Court's precedents, it appears that the state courts conflated the Supreme Court's "emergency doctrine," which is applicable in the Fourth Amendment context permits police action without a warrant, e.g., <u>Fisher</u>, 558 U.S. at 47,[4] with the "public safety" exception to the <u>Miranda</u> rule the Supreme Court carved out in <u>New York v. Quarles</u>, 467 U.S. 649, 655-56 (1984). It is beyond debate, however, that habeas relief under AEDPA may not be granted based on a mere error by the state courts in applying clearly established federal law. <u>E.g.</u>, <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1411 (2011). Rather, the state courts' application must be "objectively unreasonable[,]" 529 U.S. at 409, a "distinction [which] creates 'a substantially higher threshold' for obtaining relief than <u>de novo</u> review." <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007)). "A state court's determination that a claim lacks merit precludes federal habeas relief [under AEDPA] so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Thus, AEDPA "demands that

---

[4]

In <u>Fisher</u>, the Supreme Court held that police officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception to the Fourth Amendment's warrant requirement. 558 U.S. at 49. <u>Fisher</u> and the Supreme Court's other "emergency doctrine" cases did not involve the Fifth Amendment's privilege against self-incrimination or the issue of whether the police are exempted from issuing <u>Miranda</u> warnings prior to a custodial interrogation, such as occurred in this case.

state-court decisions be given the benefit of the doubt[.]" Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam).

The "clearly established Federal law" in this area is comprised of Miranda, 384 U.S. at 454, and Quarles, 467 U.S. at 655-59. Miranda held that statements made by a suspect in custody in response to police interrogation are inadmissible, unless preceded by certain warnings regarding the suspect's constitutional rights. See Miranda, 384 U.S. at 444-45. In Quarles, the Supreme Court announced a "public safety" exception to the per se rule barring admission of custodial statements made without Miranda warnings. Quarles, 467 U.S. at 655-59. The Supreme Court explained in Quarles that where "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule[5] protecting the Fifth Amendment's privilege against self-incrimination," the police may ask questions related to public safety before reading a suspect the Miranda warnings. 467 U.S. at 657.

---

[5]
Subsequent to Quarles, the Supreme Court decided Dickerson v. United States, 530 U.S. 428, 437-44 (2000), in which it reaffirmed Miranda and clarified that "the Miranda rule is of constitutional magnitude." United States v. Reyes, 353 F.3d 148, 152 (2d Cir. 2003) (citing Dickerson, 530 U.S. at 432); see also Dickerson, 530 U.S. at 441. Courts have observed that Dickerson has, to some extent, called into question the rationale supporting Quarles' public safety exception. E.g., Allen v. Roe, 305 F.3d 1046, 1050 n.4 (9th Cir. 2002) (citing Quarles, 467 U.S. at 654, 656-57 (stating that because Miranda was not constitutionally mandated, concern for the public safety outweighed the rule's prophylactic benefits)). However, the Supreme Court has never overruled Quarles. Therefore, the Court applies it, as it is the controlling precedent on this issue.

In this case, the state courts agreed with Petitioner that he was subjected to custodial interrogation when the sheriff's deputies questioned him about the source of blood on his clothing and shoes, and asked him about a possible victim or victims. And, it is undisputed that Petitioner did not receive <u>Miranda</u> warnings at any point that night. The question is whether <u>Quarles</u>' public safety exception applies in this case and would excuse the police officers' failure to give <u>Miranda</u> warnings to Petitioner.

The breadth of the <u>Quarles</u> holding is open to debate. <u>United States v. Jones</u>, 154 F. Supp.2d 617, 624 (S.D.N.Y. 2001) (Lynch, D.J.). On the one hand, portions of the <u>Quarles</u> decision overtly state that it is carving out a "narrow exception to the <u>Miranda</u> rule *in this case*." 467 U.S. at 658 (emphasis supplied). The majority also emphasized the "kaleidoscopic situation" facing the police, which involved "the immediate necessity of ascertaining the whereabouts of a gun" that the accused had removed from his holster and tossed aside in a public place where "an accomplice might make use of it," or "a customer or employee might later come upon it." <u>Id.</u> at 657. "*[O]n these facts*," <u>id.</u> at 655 (emphasis supplied), the majority determined that informing Quarles about his <u>Miranda</u> rights might have discouraged him from making statements to the police that would enable them to locate the firearm before it could pose a danger to the public at large. <u>Id.</u> at 657. Other language in the <u>Quarles</u> opinion suggests that the majority envisioned a broader

application of the new exception. See 467 U.S. at 658–59
(explaining that the exception "lessens the necessity of that
on-the-scene balancing process" police must conduct and stating
that "police officers can and will distinguish almost instinctively
between questions necessary to secure their own safety or the
safety of the public and questions designed solely to elicit
testimonial evidence from a suspect"); id. at 659 (predicting that
public safety exception would "free [officers] to follow their
legitimate instincts when confronting situations presenting a
danger to the public safety").

Since Quarles, the Supreme Court has not issued any decisions
defining the boundaries of the public safety exception. The Second
Circuit applied the exception in a case where the potential dangers
to public safety—a bomb discovered in the accused's apartment—were
more extreme than in Quarles. See United States v. Khalil, 214 F.3d
111, 115 (2d Cir. 2000). However, a survey of federal caselaw
"reveals a strong majority tendency to apply the public safety
exception to situations that go far beyond the 'loose weapon'
scenario of Quarles and Khalil." Jones, 154 F. Supp.2d at 626
(collecting circuit authority; citing, inter alia, United States v.
Brady, 819 F.2d 884, 887–88 (9th Cir. 1987) (officer responding to
report of a man beating a woman asked if arrested suspect had a
gun; court acknowledged distinctions from Quarles including "no
indication that [suspect] possessed a weapon [or] had placed an

unguarded weapon in a public place" and "extended" questioning; officer was trying to "control . . . a dangerous situation" involving gathering crowd)).

While Petitioner's case is not a classic "loose weapon" scenario such as that presented in Quarles, "fair minded jurists could disagree," Harrington, 562 U.S. at 101 (quotation omitted), on the reasonableness of the Court of Appeals' conclusion that the police were presented with exigent circumstances giving them reason to believe that the public safety was endangered.[6] The deputy who initially encountered Petitioner observed what appeared to be wet blood stains on the knees and thighs of Petitioner's camouflage suit, and on his sneakers and hands. Petitioner gave an odd and internally inconsistent explanation of where he was going and why he was walking on the side of the road at night in frigid temperatures, wearing clothing that was inappropriate for the weather, and carrying a car jack, lug wrench, and screw driver. Upon driving Petitioner to the location where he had parked his van, the deputy observed blood in several places on both the inside and outside of the van, and on the ground next to the van, along

---

[6]

Given the lack of the clarity on the breadth of Quarles' holding, and the material differences between the facts of this case and those of Quarles, the Court cannot find that the state courts' rulings were contrary to Quarles. See, e.g., Bell v. Cone, 535 U.S. 685, 694 (2002) ("A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts.").

with an apparently blood-soaked pair of gloves on top of a car near the van. Other deputies arrived and noticed several additional blood spots on Petitioner's face, and questioned him about the blood. Petitioner initially told them that the blood was old, but the deputies observed that it was fresh, pointing out that Petitioner's worn-out sneakers were leaving bloody footprints in the snow. This evidence reasonably supported the deputies' belief that one or more persons had sustained severe injuries, and justifiably created an immediate and heightened concern for the safety of those individuals. The record also shows that the officers' questions were addressed to discovering the location of any potentially injured person or person, and were thus in furtherance of their concern for the public safety rather than the investigation of a crime or elicitation of incriminating statements. Although the New York Court of Appeals' majority opinion did not cite <u>Quarles</u>, its ultimate holding—that the deputies did not violate Petitioner's rights under <u>Miranda</u>—does not represent an "unreasonable application" of <u>Quarles</u>' public safety exception.

## II.  Ground 1(b): Admissibility of Petitioner's Statements to His Friend at the Police Station

Petitioner claims, as he did in state court, that his conversation with Zelaskiewicz at the police station, overheard by Kautz, was the functional equivalent of interrogation. Therefore,

Petitioner argues, the Trial Court improperly allowed evidence of his statements to Zelaskiewicz to be admitted at trial.

At approximately 1:30 a.m., while photographing Petitioner at the Sheriff's Department, but prior to collecting his clothes evidentiary purposes, Kautz and Petitioner heard a live radio transmission that a deputy had discovered a "man down" on Knapp Road. Kautz did not observe any reaction from Petitioner. About two hours later, Kautz was informed that two women wanted to speak with Petitioner; one was his girlfriend and the other was his close friend, Zelaszkiewicz. Kautz spoke to them but did not reveal that a dead body had been discovered. Kautz testified that Zelaszkiewicz was insistent about seeing Petitioner. After initially rebuffing her request, Kautz decided to permit her to speak with Petitioner. Kautz reminded her that the request was completely her idea and that he would be present and taking notes during her entire conversation with Petitioner. Kautz informed Petitioner that Zelaszkiewicz wanted to talk with him, and Petitioner did not object.

During the discussion, Petitioner, Zelaszkiewicz, and Kautz were within five to six feet of each other. Kautz took notes of Zelaszkiewicz's conversation with Petitioner in their presence. Kautz testified,

> I recall [Zelaszkiewicz] asking, you know, what happened, and [Petitioner] replied, you know, I was there but I didn't do anything. She also asked if something went

> wrong in your head, and he responded no to that. She also
> asked if this
> involved an animal, and he responded no. She also asked
> if she—I believe she posed it as, Tell me there's no dead
> body, and he responded, I can't do that. . . .

Supp. Tr. at 121-22. Kautz testified about additional statements made by Petitioner that were not in response to any question by Zelaszkiewicz, which included the following: (1) "Let the chips fall where they may[;]" (2) "Oh, I'm going to be in jail somewhere I'm sure[;]" (3) "It doesn't matter what attorney I get[;]" (4) "It's going to turn out the same[;]" (5) "It's an open and shut case[;]" and (6) "I will get what I deserve I guess." Id.

Following the suppression hearing, the Trial Court rejected the contention that Zelaszkiewicz was acting as an agent of the police when she conversed with Petitioner, and further found that Petitioner, "being aware that his statements to [Zelaszkiewicz] were being monitored and recorded by Kautz," "volunteered" the statements "without solicitation by the police[.]" SR.831 (citations omitted). On direct appeal, a majority of the Appellate Division found that Zelaszkiewicz's conversation with Petitioner did not occur at the instigation of the police, that Kautz did not participate in any way in the conversation between the two and did not suggest to Zelaszkiewicz any questions she should ask or otherwise advise her how to conduct her conversation, and that Zelaszkiewicz's acts were not undertaken on behalf of the police to further a police objective but rather were motivated by her

-19-

personal concern for Petitioner's well-being. Accordingly, the Appellate Division affirmed the Trial Court's ruling denying suppression of these statements.

The Court of Appeals granted leave to appeal and held that Petitioner, though he had previously asserted his right to counsel, was not subjected to interrogation or its functional equivalent when the police allowed Zelaszkiewicz to speak with him in the presence of Kautz, even though the officer was aware of the possibility that Petitioner would incriminate himself while talking to his friend. Therefore, the Court of Appeals held, "the courts below did not err in finding that [Petitioner]'s assertions [to Zelaszkiewicz] were voluntary and admissible at trial." Doll, 21 N.Y.3d at 672.

The clearly established Supreme Court precedent here consists of Miranda, 384 U.S. 436, supra, as interpreted by the Supreme Court in later cases such as Arizona v. Mauro, 481 U.S. 520 (1987). The purpose of the Miranda holding is to "prevent[ ] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment[.]" Mauro, 481 U.S. at 529-30; brackets in original). Thus, the key inquiry is whether particular police conduct constitutes "interrogation" such as would "compel[ ] [a defendant] in any criminal case to be a witness against himself[,]" U.S. CONST., amend V. See Mauro, at 481 U.S. at 525 n. 3 (citing Malloy

v. Hogan, 378 U.S. 1 (1964) (holding that the Fourteenth Amendment requires observance of the Fifth Amendment privilege in state-court proceedings)). Miranda's "safeguards extend[ ] not only to express questioning, but also to 'its functional equivalent.'" Mauro, 481 U.S. at 526 (citation omitted). The Supreme Court has "explained the phrase 'functional equivalent' of interrogation as including 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Mauro, 481 U.S. at 526-27 (quoting Rhode Island v. Innis, 446 U.S. at 301; footnotes omitted in original)). The latter portion of this definition—whether there is a reasonable likelihood of eliciting an incriminating response aspect—"focuses primarily upon the *perceptions of the suspect*, rather than the intent of the police." Innis, 446 U.S. at 301 (emphasis supplied); accord Mauro, 481 U.S. at 527.

Here, the Court of Appeals recognized the applicable clearly established Supreme Court precedent and, in fact, quoted Mauro in its decision. As the Court of Appeals noted, it was "undisputed that the investigator did not converse with or question [Petitioner] during this encounter." Id. at 672. The Court of Appeals found it significant that Kautz "initially refused to allow [Zelaszkiewicz] to meet with [Petitioner] but he relented only after she persistently demanded to speak with [Petitioner]—and

after she was specifically informed that the officer would be in the room taking notes of the conversation." Id. (citing Mauro, 481 U.S. at 528). Moreover, Petitioner "was also clearly aware that the police officer was listening to the verbal exchange since the investigator was only a few feet away when the friends conversed." Id. (citing Mauro, 481 U.S. at 528 ("There is no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements. As the trial court found, the officers tried to discourage her from talking to her husband, but finally 'yielded to her insistent demands[.]'") (citation omitted)).

The Court of Appeals further found that Petitioner had not "established that a discussion of this nature rose to the level of a 'psychological ploy that properly could be treated as the functional equivalent of interrogation' or a subterfuge to circumvent attachment of the indelible right to counsel." Id. at 672 (quoting Mauro, 481 U.S. at 527 (noting that there was no suggestion or any evidence that the sergeant's "decision to allow Mauro's wife to see him was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation"). Likewise, there is no evidence that the police gave Zelaszkiewicz any instructions to say certain things to, or ask specific questions, of Petitioner. There was nothing about the presence of Zelaszkiewicz, who was simply a platonic friend and

former co-worker of Plaintiff, which would have made Petitioner feel compelled to unburden himself to her or make any incriminating statements. Cf. United States v. Gaddy, 894 F.2d 1307, 1311 (11th Cir. 1990) (suspect in custody was not interrogated when aunt, who was employed by the police department, urged him to tell police what he knew about a crime); Snethen v. Nix, 885 F.2d 456, 457 (8th Cir. 1989) (suspect in custody was not interrogated when he confessed after a conversation with his mother, who had told police before the conversation that "if [my son] did this, he will tell me"). The fact that Kautz's intent in allowing Zelaszkiewicz to converse with Petitioner was to obtain incriminating evidence does not require a finding that Kautz subjected Petitioner to the functional equivalent of interrogation. See Mauro, 481 U.S. at 529 ("Officers do not interrogate a suspect merely by hoping that he will incriminate himself.") (citing Innis, 446 U.S. at 299-300; Miranda, 384 U.S. at 478).

However, this Court agrees that, as the concurring Court of Appeals judge observed, Mauro is distinguishable from Petitioner's case insofar as "in Mauro, the officers asserted safety and security reasons for observing Mauro and his wife, but also acknowledged the possibility that Mauro might incriminate himself[,]" Doll, 21 N.Y.3d at 675, n.* [sic] (concurring opn.). Here, on the other hand, "the investigator's only reason for being present in the room with [Petitioner] and his friend was to

overhear and record [Petitioner]'s potentially incriminating statements." Id.; see also Supp. Tr. at 126 (Kautz testified on cross-examination that he "certainly wasn't discounting th[e] possibility" that Petitioner "would say something [the police] could use"). Thus, the Court agrees with the concurring Court of Appeals judge that the majority in Doll incorrectly recited the facts in Mauro. Nonetheless, their ultimate decision did not constitute an unreasonable application of clearly established federal law as established by the Supreme Court; nor was it contrary to clearly established law.

### III. Ground 2: Fourth Amendment Violation During the Transport of Petitioner

Petitioner reprises his claim, made on direct appeal, that the deputies violated his Fourth Amendment rights by transporting him to the Sheriff's Department without probable cause, contrary to Dunaway v. New York, 442 U.S. 200 (1979). In Dunaway, the defendant made inculpatory statements after receiving Miranda warnings during custodial interrogation, following his seizure by police officers who acted on a superior's directive to "pick up" Dunaway and "bring him in," even though that officer acknowledged that there was not enough information to supply probable cause to arrest Dunaway. Id. at 204. In Dunaway, the Supreme Court concluded that the police violated the Fourth and Fourteenth Amendments when, without probable cause to arrest, they took Dunaway into custody,

transported him to the police station, and detained him there for interrogation. Id. at 206-07.

Here, Petitioner argued on appeal that "[s]eizing a suspect 'without probable cause in the hope that something might turn up' is prohibited." Defendant's Appellate Brief ("Def. App. Br."), 2012 WL 9512010, at *64-*65 (quoting Dunaway, 442 U.S. at 218). Absent consent, he argued, probable cause was required for his seizure and transport to the Sheriff's Department. Id. Petitioner contends that all derivative evidence from his arrest without probable cause, including physical evidence and any statements he made, should have been suppressed as "fruit of the poisonous tree."

Respondent argues that Petitioner's Dunaway claim is a Fourth Amendment claim and, as such, is barred from habeas review by the doctrine of Stone v. Powell, 428 U.S. 465 (1976) ("Stone"), because New York provided an opportunity for full and fair litigation of the claim. Stone, 428 U.S. at 494-95. "Notably, all that must be shown is that the State has provided an opportunity to litigate the habeas petitioner's Fourth Amendment claim; it matters not whether the petitioner actually 'took advantage of the State's procedure.'" McClelland v. Kirkpatrick, 778 F. Supp.2d 316, 330 (W.D.N.Y. 2011) (quoting Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002)). Petitioner does not, and cannot, contend that New York failed to provide a corrective procedure to redress his Fourth Amendment claims. The Second Circuit has repeatedly stated that New York has

"complied with the requirement to make available 'a statutory mechanism' for suppression of evidence tainted by an unlawful search or seizure." McPhail v. Warden, Attica Corr. Fac., 707 F.2d 67, 69 (2d Cir. 1983) (citing N.Y. Crim. Proc. Law § 710 et seq.).

Petitioner asserts instead that there was an "unconscionable breakdown," Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en banc), in the existing process, namely, trial counsel's alleged ineffectiveness at the suppression hearing. Habeas courts in this Circuit have observed that petitioners may not make an end-run around Stone v. Powell by equating ineffective assistance of counsel with an "unconscionable breakdown." E.g., Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y. 1987). Even assuming that mere ineffectiveness on the part of trial counsel could be so extremely disruptive to state's corrective process as to constitute an "unconscionable breakdown," the Court has found that trial counsel was not ineffective. See infra, Section IV.

Petitioner also suggests that the failure of the state courts to explicitly address the Dunaway argument amounts to an "unconscionable breakdown" in the available corrective procedures. Petitioner correctly notes that the trial court did not specifically mention the Dunaway case; nor did the Fourth Department. However, the Second Circuit rejected a similar argument by a state habeas petitioner in Capellan, holding that "the mere fact the Appellate Division did not explicitly address the

[petitioner's Fourth Amendment] claim but rather adhered to its original outcome without comment concerning [certain case law] does not mean that the Appellate Division failed to conduct '"a reasoned method of inquiry into relevant questions of fact and law."'" Capellan, 975 F.2d at 71 (quoting Shaw, 654 F. Supp. at 864 (quotation omitted in original; other citation omitted). Thus, under the authority of Capellan, the state courts' failure to mention Dunaway is insufficient to establish an "unconscionable breakdown" in the corrective process utilized by Petitioner here. See, e.g., Williams v. Artus, No. 06-CV-0356VEB, 2007 WL 2712338, at *3 (W.D.N.Y. Sept. 13, 2007) (no "unconscionable breakdown" where petitioner asserted that "the Appellate Division neglected to address his claim of 'reasonableness' in connection with the stopping of his car via the use of explosives, along with the added fact that the Appellate Division simply affirmed the trial courts [sic] unsupported decision of probable cause to arrest").

Finally, Petitioner's belief that the state courts incorrectly decided the relevant issues at the suppression hearing and on direct appeal does not prove that an "unconscionable breakdown" occurred in the corrective process. It is well established that "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72. Accordingly, the

Court finds that Petitioner's <u>Dunaway</u> claim is barred from federal habeas review. <u>See</u> <u>id.</u>

## IV. Ground 3: Ineffective Assistance of Trial Counsel at the Suppression Hearing

Petitioner reasserts his claim, raised in his C.P.L. § 440.10 motion, that trial counsel was ineffective in the manner in which he litigated the Fourth Amendment issues at suppression hearing. In particular, Petitioner faults counsel for failing to "substantively address[ ] or litigate[]" a <u>Dunaway</u> claim. Petitioner submitted an affidavit from his attorney at trial, Daniel M. Killelea, Esq. ("Trial Counsel"), in which he averred that he did not "specifically challenge the legality of [Petitioner] being transported to the police station in Batavia from Lake Road," and that he had no strategic reason for failing to make that claim. The Trial Court denied the C.P.L. § 440.10 motion without a hearing, concluding that the issue of the lawfulness of Petitioner's custody was "effectively litigated" and that Petitioner "was provided meaningful representation."[7]

As an initial matter, the Court notes that this claim is not subject to the <u>Stone</u> bar. <u>See</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 382-83 (1986) (holding that <u>Stone</u>'s restriction on federal habeas

---

[7] The Second Circuit has recognized that New York State's "meaningful representation" standard for judging counsel's effectiveness, set forth in <u>People v. Baldi</u>, 54 N.Y.2d 137, 147 (1981), is not contrary to the <u>Strickland</u> standard for purposes of applying § 2254(d)(1) of AEDPA. <u>Rosario v. Ercole</u>, 601 F.3d 118, 124 (2d Cir. 2010) (citations omitted).

corpus review of Fourth Amendment claims does not extend to Sixth Amendment ineffective assistance claims founded on counsel's inadequate litigation of a Fourth Amendment issue). Therefore, the Court may consider Petitioner's ineffective assistance claim.

A petitioner challenging his conviction based on ineffective assistance of counsel has the burden of showing that (a) the counsel's performance fell below an objective standard of reasonableness, and (b) a reasonable probability exists of a different result in the proceeding, but for the errors of counsel. Strickland v. Washington, 466 U.S. 668, 688 (1984). In evaluating counsel's performance under the first prong, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The second prong of the Strickland test requires the petitioner to prove that his attorney's deficient performance prejudiced the defense. Id. at 692–93. Prejudice requires demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Harrington v. Richter, 562 U.S. at 111 (citations omitted). A reviewing court may review the Strickland prongs in

either order, and there is no reason to consider both if a petitioner makes an inadequate showing on one. Strickland, 466 U.S. at 697. The Court here addresses the prejudice component first.

Petitioner acknowledges that the Dunaway issue was, in fact, raised on direct appeal, but he claims that it was not preserved due to Trial Counsel's failure to raise it before the Trial Court, and therefore the issue was not addressed by either the Appellate Division or the Court of Appeals. These assertions are belied by the record.

In his Defendant's Notice of Motion dated April 20, 2009, Trial Counsel cited the Dunaway case. SR.413. Trial Counsel's post-suppression hearing brief challenged the detention and transport of Petitioner to the police station, arguing that "[a]t the time [Petitioner] was handcuffed and placed into the rear of a police car from which he could not leave, there were no facts known to Deputy Diehl which rose to the level of probable cause to believe defendant had committed any offense." SR.785. Trial Counsel acknowledged that the police may lawfully detain someone for a brief period prior to the existence of probable cause, but here, Petitioner was detained in the police car "following his initial detention and handcuffing for several hours before the police ever contacted the owner of the business located at the intersection of Route 5 and North Lake Road[,]" and he "wasn't free to leave." Trial Counsel concluded by arguing that Petitioner remained in

handcuffs and police custody for nearly five hours prior to the "potential existence of probable cause to effect his lawful arrest" and that all the evidence that flowed from the arrest must be suppressed. SR.789.

The Trial Court, in its decision denying suppression, observed that Petitioner's "detention ripened into a custodial situation when, after additional evidence of a bloody confrontation was found at the parking lot, [Petitioner] remained handcuffed, was personally searched, and transported to the Sheriffs Office. . . . There being no corpus delicti, the Police had no probable cause to arrest [Petitioner] based on his suspicious circumstances." Thus, the Trial Court acknowledged Petitioner's challenge to all phases of his custodial detention.

Then, in his brief on direct appeal, Petitioner's appellate counsel asserted that, "[a]s argued below, [Petitioner] challenges the legality of his being placed in custody for such an extended period of time, as well as his eventual transport to the station." SR.043. In his subsequent appeal to the Court of Appeals, appellate counsel reiterated the argument that Petitioner's constitutional rights were violated by his "pre-warrant arrest and subsequent transport to the station, as there was no probable cause." SR.1325.

Furthermore, neither the Appellate Division nor the Court of Appeals held that a Dunaway issue was unpreserved. The Appellate Division rejected Petitioner's "contention that the deputies were

only permitted to detain him briefly while they searched the immediate area for a victim" because "[a]n emergency that unquestionably threatened the life of a victim or victims existed, . . . and [he] provided the deputies with the best avenue of attempting to provide assistance to such victim or victims." People v. Doll, 98 A.D.3d at 368. In light of the "'exigencies of the situation,'" id. (quotation omitted), the Appellate Division concluded, the actions of the deputies in detaining him were "'objectively reasonable under the Fourth Amendment.'" Id. (quotation omitted).

Subsequently, the Court of Appeals held that Petitioner's challenge to the legality of his detention by the police was without merit. Doll, 21 N.Y.3d at 672-73. Based on the foregoing evidence that both appellate courts considered the legality of the entire period of Petitioner's detention, notwithstanding Trial Counsel's purported failure to adequately brief a claim based on Dunaway, Petitioner cannot demonstrate that he was prejudiced. See, e.g., Swail v. Hunt, 742 F. Supp.2d 352, 364 (W.D.N.Y. 2010) (habeas petitioner could not demonstrate that he was prejudiced by trial counsel's failure to preserve the insufficiency claim by means of a renewed motion for a trial order of dismissal after the defense case, because the Appellate Division considered the merits of the insufficiency claim, notwithstanding the lack of preservation). As Petitioner cannot fulfill Strickland's two-

pronged test even under <u>de novo</u> review, he necessarily cannot demonstrate that the Trial Court unreasonably applied <u>Strickland</u> in rejecting his claim of ineffective assistance.

## CONCLUSION

For the reasons discussed above, Petitioner's request for a writ of habeas corpus is denied, and the petition is dismissed. Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:    December    , 2018
          Rochester, New York